SANJIV N. SINGH, A PROFESSIONAL LAW CORPORATION
Sanjiv N. Singh (SBN 193525)
1650 S. Amphlett Blvd. Suite 220
San Mateo, CA 94402
Phone: (650) 389-2255
Email: ssingh@sanjivnsingh.com

INDRAJANA LAW GROUP, A PROFESSIONAL LAW CORPORATION
Michael B. Indrajana (SBN 258329)
1650 S. Amphlett Blvd. Suite 220
San Mateo, CA 94402
Phone: (650) 597-0928
Email: michael@indrajana.com

Attorneys for Plaintiff FOUNDER INSTITUTE INCORPORATED

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FOUNDER INSTITUTE INCORPORATED, a Delaware Corporation,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HARTFORD FINANCIAL SERVICES GROUP INCORPORATED, a corporation doing business in California; SENTINEL INSURANCE COMPANY, LIMITED, a corporation doing business in California; and DOES 1 through 50, inclusive,**<br><br>**Defendants.** | **Case No.: 3:20-cv-04466-VC**<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>**1. BREACH OF CONTRACT;**<br>**2. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**3. BAD FAITH DENIAL;**<br>**4. DECLARATORY RELIEF;**<br>**5. UNJUST ENRICHMENT;**<br>**6. UNFAIR COMPETITION UNDER BUS. & PROF. CODE § 17200 ET SEQ.;**<br>**7. INJUNCTIVE RELIEF UNDER BUS. & PROF. CODE § 17200 ET SEQ.**<br><br>**JURY TRIAL DEMANDED** |

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

Plaintiff FOUNDER INSTITUTE INCORPORATED ("Founder"), a Delaware Corporation doing business in California brings this Third Amended Complaint[1], alleging against HARTFORD FINANCIAL SERVICES GROUP INC. ("HFSG"), a corporation, and SENTINEL INSURANCE COMPANY LIMITED ("Sentinel"), a corporation, both doing business in California, and DOES 1 THROUGH 50, as follows:

## INTRODUCTION

1. The COVID-19 pandemic was a catastrophe faced by thousands of business in the state of California, with civil ordinances requiring county and statewide shutdowns and stay-at-home orders which crippled businesses. It was the exact kind of loss which insurers like Hartford and its affiliates marketed to business owners. But when the pandemic hit and businesses began to suffer losses due to shut down orders, insurance companies like Defendants balked.

2. This particular case is an insurance bad faith lawsuit brought by Plaintiff FOUNDER INSTITUTE, INCORPORATED, a Delaware Corporation that owns and operates a vital startup incubator in Palo Alto, California (hereinafter "Plaintiff" or "Founder") against HARTFORD FINANCIAL SERVICES GROUP INCORPORATED

---

[1] This is the Third Amended Complaint filed with the leave granted by the Court on October 22, 2020. On October 28, 2020, Plaintiff learned that a business with the same policy and same coverage filed a lawsuit against Sentinel which is currently pending in the Southern District of California before Judge Cynthia Ann Bashant in the case titled *Mostre Exhibits, LLC v. Sentinel Insurance Company, Limited* Case No. 3:20-cv-01332. Hartford and Sentinel did not file a Rule 12(b)(6) motion in that lawsuit despite the fact it literally has identical provisions--counsel for the plaintiff in that case immediately contacted Plaintiff and provided Plaintiff the relevant documentation and alerted Plaintiff to the identical aspects of the coverage and purported exclusions. In the *Mostre Exhibits, LLC* case, Sentinel has answered (indeed answered very quickly) and the case is proceeding. On October 28, 2020, Counselor Indrajana sent a written inquiry to Counsel Anthony Anscombe, defense counsel for Defendants, inquiring as to the discordant approach to the two nearly identical cases. Defendant Sentinel has not responded to date.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

("HFSG"), a corporation, SENTINEL INSURANCE COMPANY, LIMITED ("Sentinel"), a corporation, and possible Does (collectively, the "Hartford Defendants"). Plaintiff seeks damages stemming from Defendants' bad faith handling and denial of Plaintiff's claim for business income loss coverage. Plaintiff, in good faith, based on the language of its policy and for the reason many businesses bought insurance policies with business income interruption clauses, reasonably expected that Defendants would provide coverage during these unprecedented times for the loss of business income Plaintiff has suffered due to the stay-at-home ordinances effected statewide, including in Santa Clara County. Specifically, as a result of civil ordinances, Plaintiff's central operations or so-called scheduled premises were shut down or severely reduced in operations, crippling its ability to coordinate events which it was responsible for running and managing, and thereby crippling its revenue stream.

3. Defendants, meanwhile, not only have failed to provide the requested coverage, but have engaged in deceptive and unfair business practices to evade responsibility for doing so. At a moment in world history when insurance companies should be stepping up, Defendants hid behind procedures and conduct that appear to be bad faith and motivated only by profit. In this case, Defendants pre-rejected the claim before it was even submitted, and then relied on quick, premature, and incomplete analysis of their own policy language, and of the nature of the losses in question.

**PARTIES**

4. At all relevant times, Plaintiff Founder Institute Incorporated was and is a Delaware corporation and is authorized to do business and is doing business in the State of California, County of Santa Clara. Plaintiff owns, operates, manages, and controls a startup incubator practice located in Palo Alto, California.

5. At all relevant times, Defendants Hartford Financial Services Group Incorporated ("HFSG"), a corporation, and Sentinel Insurance Company Limited ("Sentinel Insurance" or "Sentinel"), (collectively, the "Hartford Defendants") are doing business

and maintaining regular offices in the State of California and doing business regularly in Santa Clara County. Hartford Defendants are conducting insurance business, including the marketing, sale and provision of business insurance policies and the process of handling claims, in the State of California and the basis of this suit arises out of such conduct.

6. HFSG, and Sentinel Insurance and their executive officers list their headquarters as the same corporate address in Hartford, Connecticut, but all the entities do business in the State of California. Sentinel Insurance is believed to be a subsidiary or division of The Hartford transacting in California. Furthermore, the Hartford Defendants operate websites in California specifically selling its Hartford commercial products to California businesses. One such website is: thehartford.com/business-insurance/California

7. Plaintiff does not know the true names and capacities, whether individual, associate, or otherwise, of Defendants DOES 1 through 50, and therefore designate those Defendants by such fictitious names. Each of the Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein and proximately caused the injuries suffered by the Plaintiff. DOES may include other underwriters, agents, or individuals who participated in decisions or ratified decisions that led to or constituted the bad faith denial and misconduct of Defendants outlined in this Complaint. Plaintiff will amend this Complaint accordingly to allege the true names and capacities of these DOE Defendants when/if the same becomes known to Plaintiff.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Plaintiff Founder Institute and the Hartford Defendants are citizens of different states and the amount of controversy exceeds $75,000.00 exclusive of interests and costs.

9. This Court has personal jurisdiction over Defendant Sentinel Insurance because Sentinel Insurance regularly conducts and transacts business in this state, including having issued the insurance policy currently held by Plaintiff.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

10. This Court has personal jurisdiction over Defendant Hartford because Hartford regularly conducts and transacts business in this state, and on information and belief is the parent company of Sentinel Insurance. The copy of Plaintiff's insurance policy sold and marketed in California contains numerous references to Hartford, including its logo, the phrase "This is Hartford," and references to The Hartford's webpage.

11. Venue is proper in this Court because pursuant to 28 U.S.C. § 1391(2), the acts and/or omissions complained of took place, in whole or in part, within Santa Clara County, California. Defendants conduct business extensively throughout California, marketing their insurance policies and selling their insurance policies to thousands of insured businesses and consumer businesses in California.

## GENERAL ALLEGATIONS

12. All allegations in this Complaint are based on information and belief and/or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

### The Hartford Defendants

13. The Hartford Financial Services Group, Inc., usually known as The Hartford, is a Fortune 500 investment and insurance company headquartered in its namesake city of Hartford, Connecticut. The company's earnings are divided between property and casualty operations, group benefits, and mutual funds. The Hartford was founded in 1810 in Hartford, Connecticut, as the Hartford Fire Insurance Company.

14. According to its website at thehartford.com, HFSG, doing business as The Hartford, is a financial holding company for a group of insurance and non-insurance subsidiaries, which includes Sentinel Insurance Company Limited ("Sentinel"). According to thehartford.com's legal notice, Sentinel is authorized to transact the business of insurance in all states, including the State of California.

15. Indeed, there is a conscious and concerted effort by the Hartford Defendants to market themselves as "The Hartford." Specifically, the copy of the policy document sent

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

to Founder by The Hartford is replete with references to The Hartford, and any claims and/or customer support are conducted through either the thehartford.com website, or by phone in which the employees identify themselves as The Hartford employees and adjusters.

**The Founder Institute and Its Hartford Policy**

16. Plaintiff's business is a startup incubator in Palo Alto California. The Founder Institute is the world's largest pre-seed startup accelerator, with nationwide alumni that have built numerous companies that have provided employment and economic stimulus in cities across the nation. Its Palo Alto physical headquarters is the key to keeping its networking operations running and is the central headquarters from which the majority of their operations, events, and revenue-generating activities are planned, conceived and coordinated. Cutting off access to Plaintiff's physical headquarters prevented Plaintiff from conducting its revenue-generating business in the following ways: (1) being unable to conduct in-person teaching sessions, workshops, and seminars on the premises and (2) being unable to conduct paid live-events for recruiting, networking and academic purposes on the premises, and otherwise (3) being unable to conduct other academic or instructional activities commonly held by typical academic and/or instructional institutions on the premises. Furthermore, Founder was forced to shut down operations and reinvent its business model to convert all of their programs and curriculums they have been running in person for more than ten years into a completely virtual online platform. It was not simply a matter of the general economic slowdown.

17. At all relevant times, since 2011 Plaintiff has been a Hartford policyholder, currently insured under Hartford's business policy number 57 SBA BA6715 (the "All-Risk Policy").

18. The All-Risk Policy is currently in full effect, providing commercial business policy coverage including coverage for lost business income which occurred during the policy period. The policy was automatically renewed by The Hartford on June 23, 2020.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

19. Plaintiff faithfully paid policy premiums to Defendants, specifically to provide additional coverage including but not limited to loss of business income due to Civil Authority or civil ordinances. The All-Risk policy expressly states: "In return for the payment of the premium and subject to all of the terms of this policy, we agree with you to provide insurance as stated in this policy."

20. Plaintiff, in addition to dutifully paying policy premiums to Defendants, has performed all of its obligations under Hartford policy number 57 SBA BA6715. The Covered Property, with respect to the Building and Business Personal Property Coverage, is Founder Institute Incorporated Headquarters, located at 3337 El Camino Real, Palo Alto, CA 94306.

21. Property and Business Insurance can be sold for coverage on specific perils, which would limit coverage to those perils specifically written into an insurance policy (such as fire, earthquakes, etc.). Other insurance policies, such as the one sold by the Hartford Defendants, are "all-risk" insurance policies, providing coverage for all losses except those that are excluded by the explicit, unambiguous words of the policy. Additionally, Hartford Defendants have marketed and expressly represented their policy products as protecting businesses from whatever perils and losses they might face.

22. Under the Policy, Civil Authority coverage appears to be provided for loss of income, and appears to be available both for a shorter period and for an extended period under certain conditions.

23. The All-Risk Policy provides for coverage as follows:

> **A. COVERAGE**
> We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.

Exhibit A at p. 29, Form SS 00 07 07 05 p.1

The All-Risk Policy defines Covered Cause of Loss as follows:

> **3. Covered Causes of Loss**
> RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
> a. Excluded in Section B., EXCLUSIONS; or
> b. Limited in Paragraph A.4. Limitations; that follow.
>
> Exhibit A at p. 30, Form SS 00 07 07 05 p.2

Additional coverages in the All-Risk Policy include:

> **o. Business Income**
>
> **(1)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.
>
> **(2)** With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the "scheduled premises" are located, your "scheduled premises" also means:
>
> **(a)** The portion of the building which you rent, lease or occupy; and
>
> **(b)** Any area within the building or on the site at which the "scheduled premises" are located, but only if that area services, or is used to gain access to, the "scheduled premises".
>
> **(3)** We will only pay for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or physical damage.
>
> This Additional Coverage is not subject to the Limits of Insurance.
>
> **(4)** Business Income means the:
>
> **(a)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and
>
> **(b)** Continuing normal operating expenses incurred, including payroll.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

**(5)** With respect to the coverage provided in this Additional Coverage, suspension means:
**(a)** The partial slowdown or complete cessation of your business activities; or
**(b)** That part or all of the "scheduled premises" is rendered untentantable[sic] as a result of a Covered Cause of Loss if coverage for Business Income applies to the policy.

Exhibit A at p.38, Form SS 00 07 07 05 p.10

**q. Civil Authority**

(1) This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".

(2) The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of:

(a) When access is permitted to your "scheduled premises"; or

(b) 30 consecutive days after the order of the civil authority.

**r. Extended Business Income**

(1) If the necessary suspension of your"operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a) Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your "operations" with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or

(ii) 30 consecutive days after the date determined in (1)(a) above.

Loss of Business Income must be caused by direct physical loss or physical damage at the "scheduled premises" caused by or resulting from a Covered Cause of Loss.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

> (2) With respect to the coverage provided in this Additional Coverage, suspension means:
>
> (a) The partial slowdown or complete cessation of your business activities; and
>
> (b) That a part or all of the "scheduled premises" is rendered untenantable as a result of a Covered Cause of loss.

Exhibit A at p.39, Form SS 00 07 07 05 p.11

The Limited Fungi, Bacteria or Virus Coverage (or the so-called "Virus Exclusion") provides:

> **i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus**
> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
> (1) Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.
> (2) But if "fungi", wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, we will pay for the loss or damage caused by that "specified cause of loss".
> This exclusion does not apply:
> (1) When "fungi", wet or dry rot, bacteria or virus results from fire or lightning; or
> (2) To the extent that coverage is provided in the Additional Coverage – Limited Coverage for "Fungi", Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning.
> This exclusion applies whether or not the loss event results in widespread damage or affects a substantial area.

Exhibit A at p.124, Form SS 40 93 07 05 p.2

24. It is notable that the policy does not define, address, or exclude losses or physical damage or alteration related to saliva, or respiratory droplets (large or small). It does provide coverage for some loss associated with viruses ("specified causes of loss"), does

not expressly exclude a pandemic ordinance, and it does include losses due to other geographically affected civil phenomena such as civil riots and civil commotion.

**The COVID-19 Pandemic**

25. On or about December of 2019, the so-called pathogen SARS CoV-2 ("COVID-19") was first identified in humans in Wuhan, China.

26. As is now commonly known, in an unprecedented event that has not occurred in more than a century, a world pandemic of global proportions then ensued. By March 11, 2020, the World Health Organization officially recognized the pandemic. According to the Centers for Disease Control and Prevention, the virus has already claimed an estimated 231,988 lives in the United States, with a reported 9,357,245 confirmed cases in the United States as of November 5, 2020, at 9:45 AM Pacific Standard Time. The ordinances described below were issued with multiple objectives to address a complex national crisis. The virus was clearly being transmitted at an alarming rate.

27. It is understood that the COVID-19 virus can be spread and transmitted through bodily fluids such as saliva, respiratory droplets, or mucus.

28. Health experts, such as the CDC, have identified two principle routes of transmission, one where the virus travels in respiratory droplets or droplet nuclei through the air from person to person, and the other where the virus may travel in saliva droplets or other human droplets and those droplets then land on nearby surfaces. It is the droplets, not the virus, that is the actual physical substance targeted by the ordinances, and the vast majority of droplets are physically tangible, cause damage, but do not contain virus particles. By reducing the spread of the droplets in the environment, the goal is to reduce the transmission of the virus that may travel in some of the droplets dispersed by infected individuals as they talk, breath, sneeze, cough, etc. Emerging evidence shows that COVID-19 may be present in saliva droplets or respiratory droplets which are formed from mucus coating of the lung or vocal cords or

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

droplet nuclei.[2] These droplets are not viruses, but a virus or other pathogen can sometimes travel in said droplets.

29. The droplets, whether saliva or respiratory, can leave a human body (by sneezing, coughing, or on a hand that has just touched a mouth or nose) and then land on surfaces such as doorknobs, rail handles, utensils, tables, chairs, car seats, bus seats, benches, and so forth. In a normal setting prior to the pandemic, this kind of passage of droplets occur every day and is typically addressed through daily cleaning protocols used by businesses, schools, institutions, cities, and other entities. When the pandemic hit, the human droplets became a focus of concern because they can possibly become the medium for transmission and carry the virus, infecting people who are exposed to the droplets that contain virus particles.

30. Some studies suggest that the physical dimension and properties of droplets affect how the viruses which may be carried in the droplets are carried. Droplets which are greater than 5 μm in diameter may land on fomites, and then be passed to individuals. Then, if the droplet contains the COVID-19 virus, the fomite may pass the virus to an individual. Droplets smaller than 5 μm are referred to as droplet nuclei and get aerosolized. If they contain the virus, they can facilitate airborne transmission. Indeed, the particle size of the microscopic virus is approximately 0.125 μm, but the average droplet size is 5 μm. Proportionately, the average droplet is therefore 40 times larger than the virus, and the coalescence of multiple droplets may form a liquid layer that is visible to the naked eye. Some saliva droplets are also large enough to be seen by the naked eye. In other words, the droplets have actual physical presence and alter and damage surfaces where they are present.

---

[2] Dbouk T, Drikakis D. On coughing and airborne droplet transmission to humans. Phys Fluids **32**, 053310 (2020); https://doi.org/10.1063/5.0011960

31. It should be noted that the human droplets are factually distinctive material from the virus particles. Indeed, the two completely distinctive physical matters are not one and the same.[3]

---

[3] Scientific studies that expressly distinguish between human droplets and virus particles include but are not limited to:

- Stadnyski V., et al. The airborne lifetime of small speech droplets and their potential importance in SARS-CoV-2 transmission. Proceedings of the National Academy of Sciences Jun 2020, 117 (22) 11875-11877; DOI: 10.1073/pnas.2006874117. URL: https://www.pnas.org/content/117/22/11875 - Last accessed Nov. 3, 2020.
- Timmons Sund L, Bhatt NK, Ference EH, Kim W, Johns MM III. Respiratory Particle Emission During Voice Assessment and Therapy Tasks in a Single Subject. J Voice. 2020 Oct 23. doi: 10.1016/j.jvoice.2020.10.008. Epub ahead of print. PMCID: PMC7582043. URL: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7582043/ - Last accessed Nov. 3, 2020.
- Abuhegazy M, Talaat K, Anderoglu O, Poroseva SV. Numerical investigation of aerosol transport in a classroom with relevance to COVID-19. Phys Fluids (1994). 2020 Oct 1;32(10):103311. doi: 10.1063/5.0029118. PMID: 33100808; PMCID: PMC7583363. URL: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7583363/ - Last accessed Nov. 3, 2020.
- Lee BU. Minimum Sizes of Respiratory Particles Carrying SARS-CoV-2 and the Possibility of Aerosol Generation. Int J Environ Res Public Health. 2020 Sep 23;17(19):6960. doi: 10.3390/ijerph17196960. PMID: 32977575; PMCID: PMC7579175. URL: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7579175/ - Last accessed Nov. 3, 2020.
- Anghel L, Popovici CG, Stătescu C, Sascău R, Verdeș M, Ciocan V, Șerban IL, Mărănducă MA, Hudișteanu SV, Țurcanu FE. Impact of HVAC-Systems on the Dispersion of Infectious Aerosols in a Cardiac Intensive Care Unit. Int J Environ Res Public Health. 2020 Sep 10;17(18):6582. doi: 10.3390/ijerph17186582. PMID: 32927583; PMCID: PMC7560168. URL: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7560168/ - Last accessed Nov. 3, 2020.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

32. As such, the droplets (not the virus itself) are and were the real focus of ordinances seeking to limit human to fomite to human transmission and should have been the real focus of damage or loss investigation by Defendants. The droplets are of sufficient size to alter any surface they land on regardless of whether they have the virus in them. Consider the following diagram from a study conducted by the Proceedings of the National Academy of Sciences of the United States of America[4] showing the role of droplets in carrying virus particles:




Transmission of COVID-19. Human atomization of viruses arises from coughing or sneezing of an infected person, producing virus-containing droplets (>5 μm) and aerosols (<5 μm). Virus transmission from person to person occurs through direct/indirect contact and airborne aerosol/droplet routes. Large droplets mainly settle out of air to cause person/object contamination, while aerosols are efficiently dispersed in air. Direct and airborne transmissions occur in short range and extended distance/time, respectively. Inhaled airborne viruses deposit directly into the human respiration tract.

(Source: Fig. 4, Zhang, et al. *Identifying Airborne Transmission as the Dominant Route for the Spread of COVID-19.* PNAS June 30, 2020 117 (26) 14857-14863; first published June 11, 2020 – see footnote 4.)

33. Recent data suggests conflicting views on how much virus is present on surfaces contaminated by human saliva droplets or human respiratory droplets that contain virus particles. The CDC website as of October 5, 2020, states that the principal mode by which

---

[4] Zhang, et al. *Identifying Airborne Transmission as the Dominant Route for the Spread of COVID-19*. PNAS June 30, 2020 117 (26) 14857-14863; first published June 11, 2020 (https://doi.org/10.1073/pnas.2009637117 - last accessed October 28, 2020)

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

people are infected with SARS-CoV-2 (the virus that causes COVID-19) is through exposure to respiratory droplets carrying infectious virus particles.[5] On the other hand, the same CDC webpage goes on to say that the virus may remain viable in the droplets on surfaces for hours to days. *Id.*

34. On March 12, 2020, the Governor of the State of California Gavin Newsom banned gatherings over 250 people.

35. On March 16, 2020, the health departments of numerous counties, including San Francisco, San Mateo, Santa Cruz, and Santa Clara, announced, with the City of Berkeley, a legal order directing residents to shelter in place for three weeks beginning midnight March 17, 2020 to April 7, 2020. It was well recognized by all counties that part of the reason for the issuance of the orders was the need to reduce the person to person transmission of the virus and reduce the contamination of frequently contacted surfaces with the droplets that might contain the virus. Orders were then extended through May 3, 2020.

36. By March 19, 2020, the Governor of California issued a statewide stay at home order ("State of California Order") that would be in effect until further notice and is still in effect as this pandemic continues.

37. On April 29th, 2020, the Health Office of Santa Clara continued the shelter-in-place order to be in effect until at least May 31, 2020.

38. The Santa Clara Ordinance and State of California Order, in an unprecedented manner, required necessary measures to keep people at home and off the streets and out of areas of public gatherings, and thereby crippled the major source of revenue for numerous businesses. As a direct and proximate result of this Order, access to businesses like Founder Institute have been specifically prohibited, and it is thus not

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html (last accessed: October 28, 2020)

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

generally physically accessible to visitors, employees, partners, or clients. This limited access to Founder Institute left the institute: (1) unable to conduct in person teaching sessions, workshops, and seminars on the premises and (2) unable to conduct paid live-events for recruiting, networking and academic purposes on the premises, and otherwise (3) unable to conduct other academic or instructional activities commonly held by typical academic and/or instructional institutions on the premises. Furthermore, Founder was forced to shut down and/or reduce operations to convert all of their programs and curriculums they have been running in person for more than ten years into a completely virtual online platform. It was not simply a matter of the general economic slowdown.

39. It is extremely important to note that the various stay-at-home and other civil ordinances were put in place not to eliminate the virus, but aimed at eliminating the possible spread of virus believed at the time to be possible through various transmission methods and community spread. Specifically, at the time, because there was no way to screen whether a person is infectious with absolute certainty, especially when an infected person may be asymptomatic or pre-symptomatic, and there was no way to tell whether a person's human droplets may or may not contain virus particles. Thus, the only way to prevent large-scale community infection was to isolate everyone to stay at home. Indeed, instances in which a large number of people become infected simultaneously are now known as super-spreading events, and the phenomenon of super-spreading events reveals the significance of the distinction between droplets and virus particles. In a super spreading event, most of the human droplets present would not contain the virus, but the presence of one or a few highly infectious persons (also known as superspreaders) could still result in the infection of a large number of people. Hence, the need for the initial ordinances to target all droplets and restrict widespread access to business, public areas, and other gathering spaces.

40. COVID-19 is particularly unique given the widespread evidence that community spread of the disease is possible by COVID-19 infected individuals who do not have any physical symptoms. Thus, it is even more difficult for any business to gauge the danger and threat of having any individuals operating in or visiting physical locations. The WHO[6] has concluded that the "extent of truly asymptomatic infection in the community remains unknown." It is also believed that both asymptomatic transmission (by "people who are infected who never develop symptoms") and pre-symptomatic transmission (by "people who are infected but have not developed symptoms yet") is possible and widespread in the current COVID-19 pandemic. In the context of asymptomatic transmission, the travel and path of respiratory droplets became a concern for cities and counties who were looking for any way to reduce the spread of the virus, and who believed that reducing overall droplet spread would reduce viral transmission.

41. Various studies, summarized by the WHO[7], have identified multiple methods of transmission, including:

a. **Contact**: transmission of COVID-19 can occur through "direct, indirect, or close contact with infected people."

b. **Respiratory Secretions, Droplets, and Saliva**: transmission of COVID-19 is possible when respiratory secretions, droplets, or saliva are expelled when people cough, sneeze, talk, or open their mouths for any reason, but only in cases where the droplets contain the pathogenic COVID-19 particles.

c. **Airborne:** there is now evidence from various studies that COVID-19 infectious agents can be disseminated in the air by "droplet nuclei

---

[6] https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions - Last accessed on November 5, 2020.
[7] https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions - Last accessed on November 5, 2020.



SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

(aerosols) which are separate and distinct from the virus that remain infectious if they contain the virus when suspended in air over long distances and time." Various outbreak reports of COVID-19 point to airborne spread of the virus through respiratory droplet or droplet nuclei, especially in smaller, indoor settings, exacerbated by poor ventilation and airflow.

d. **Fomites:** Respiratory Secretions, droplets, saliva, and other biological samples can land on everyday surfaces and objects, creating so-called fomites.

e. **Other Biological Samples:** Urine, feces, and blood have been found to contain viable COVID-19 particles, thus opening the possibility of further transmission of the disease.

42. Thus, as set forth above, when present in human respiratory or saliva droplets, COVID-19 has been transmitted by human-to-human interaction, contact with fomites, and by various other modes of transmission in the State of California and County of Santa Clara.

43. The threat of the presence of COVID-19 particles, or in the alternative, human droplets which themselves damage surfaces and alter surfaces and which are at risk for having virus particles, renders items at physical properties, like the headquarters of Founder Institute, and surrounding areas of egress, ingress, or access, unsafe and physically damaged and/or altered.

44. The threat of the presence of any COVID-19 particles, or in the alternative, human droplets which themselves damage surfaces and alter surfaces and which are at risk for having virus particles, constitutes direct physical harm, physical damage, and physical loss to Plaintiff's property or surrounding property.

45. It is important to note that the presence of possibly infected respiratory droplets, saliva, or airborne particles, constitutes physical damage to Plaintiff's property or

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

surrounding property. Said droplets, with or without virus particles, have physically changed and physically damaged Plaintiff's property or surrounding property. Indeed, human droplets have actual physical attributes that alter surfaces and make surfaces essentially dirty. A respiratory droplet may be smaller and have a more mucus like quality, whereas a saliva droplet may be larger. A droplet nuclei is even smaller and can be aerosolized. Naturally produced droplets, without a virus, contain various cell types including epithelial cells, immune system cells, and electrolytes such as $Na^+$, $K^+$, and $Cl^-$.[8]

46. The presence of humans at any physical property is a physical threat given the various modes of transmission possible for COVID-19, exacerbated by the fact that COVID-19 can be held and transmitted by individuals with no known physical symptoms. Thus, the mere presence of any humans on physical properties makes physical locations hazardous, unsafe, and unstable, especially given the wide-ranging modes of transmission for COVID-19 and the nature of human droplets.

47. Against this backdrop and given concern over the role of human droplets in COVID-19 transmission, State and local civil authority ordinances were issued suspending normal, in-person, physical visitation of business properties to curb the threat of further spread and transmission of COVID-19 by any of the currently-known modes of transmission including the presence or spread of human droplets.

**Rapid Denial of Founder Institute's Claim in Apparent Bad Faith**

48. In good faith, Founder Institute promptly notified Defendants on April 7, 2020, at 9:18AM, that they would be seeking claims for business loss due to the civil ordinances. Twenty four minutes (not hours) later, Defendants issued what appeared to be a cut and

---

[8] Atkinson J, Chartier Y, Pessoa-Silva CL, et al., editors. Natural Ventilation for Infection Control in Health-Care Settings. Geneva: World Health Organization; 2009. Annex C, Respiratory droplets. Available from: https://www.ncbi.nlm.nih.gov/books/NBK143281/ - Last accessed November 5, 2020

pasted pre-denial from a Mimi Watson stating the following: "This is not a covered loss on your policy but, I have called the claim into Hartford and someone will contact you in a week or so. I understand your situation as we are all in this together." A portion of the email appeared as though the agent cut and pasted a screen shot of excerpt from a pre-drafted denial letter and sent it out. The email made no reference to Defendants attempting to understand the nature of the physical loss or damage at issue, or to distinguish between the physical loss and alteration caused by human droplets versus actual virus particles, and for good reason. By April 7, 2020, the world was still getting its collective resources, researchers, specialists, scientists, and experts around the science of the virus transmission and the role of human droplets.

49. On April 7, 2020, Founder received a denial letter from the Hartford, attached hereto as Exhibit B. On information and belief and based on actual communications, Defendants' conduct above was ratified, ordered, and encouraged by officers of Defendants in order to effect a strategy to rapidly deny, deflect, and minimize COVID-19 related claims and losses for Defendants.

50. In fact, on information and belief, Plaintiff's counsel has learned that there are allegations that on or about March 17, 2020, members of the insurance industry are believed to have sent companywide emails to their claims offices which were then distributed to agents and representatives in different parts of California directing agents and representatives to spread the word that there was no coverage and dissuade businesses from submitting claims. There is also emerging evidence of attempts to prematurely lobby the California Department of Insurance on these issues.

**Defendants Have a Duty to Diligently Search for Evidence that Supports Plaintiff's Claim, and Failed to Do So**

51. According to California law, an insurance company, like the Defendants, has a duty to, in good faith, fully investigate the claims and considerations of its clients who faithfully pay premiums and uphold all obligations for coverage under the policy. The insurance company must investigate all possible grounds of coverage, and in order to

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

perform a reasonable and proper investigation, an insurance company must also investigate all bases for the insured's claim. Hartford Defendants should have conducted a fair evaluation and thorough investigation of the exact nature of how COVID-19 is transmitted before rapidly concluding there is no coverage and denying Plaintiff's claim. A fair evaluation, and thorough investigation was necessary, but Hartford Defendants chose not to do one. Indeed, a proper evaluation would have revealed that the terms of the All-Risk Policy should have provided multiple bases for coverage warranting further expert evaluation, including loss or damage caused by droplets, loss or damage caused by the virus, and also considerations of whether there was business income loss and suspension of operations due to loss or damage at the subject premises or surrounding areas controlling access to the premises.

52. It is well recognized that, "[w]hen investigating a claim, an insurance company has a duty to diligently search for evidence which support its insured's claim. If it seeks to discover only the evidence that defeats the claim it holds its own interest above that of the insured." *See Mariscal v. Old Republic Life Ins. Co.* (1996) 42 Cal.App.4th 1617, 1620. In this case, Defendants issued blanket denials of all claims, including Plaintiff's claims, without fulfilling its obligation to conduct a full, fair, and thorough investigation of the claims with evidence.

53. Specifically, Hartford Defendants are attempting to argue that a purported "Limited Fungi, Bacteria, or Virus Coverage" provision is an exclusion despite the fact that the declarations page and title of the exclusion itself makes no mention of the presence of an exclusion. Under *Haynes v. Farmers Ins. Exch.*, 32 Cal.4th 1198, 1206-07 (2004), the California Supreme Court found that it was determinative that the declarations page failed to alert a reader to the fact that the subject endorsement contained a paragraph limiting coverage for permissive users for an amount lower than the policy coverages prominently displayed in specific dollar amounts on the same

declarations page. Under *Haynes*, that exclusion language should not apply, and at the very least, should create an ambiguity in the Policy.

54. Moreover, if Hartford Defendants wished to include a proper virus exclusion, rather than an alleged exclusion masquerading as a coverage endorsement, it already evidently knew how to do so. For example, Hartford Defendants could have simply mirrored the subject policy written by its Hartford parent company HFSG from *S.A. Hospitality Group v. Hartford Fire Ins. Co.,* Case No. 3:20-cv-01033-VLB (July 22, 2020, D. of Ct.). That policy included a clear exclusionary endorsement entitled "New York – Exclusion of Loss Due to Virus or Bacteria," attached hereto as <u>Exhibit C</u>. No such endorsement exists here.

55. Hartford Defendants' position that the human droplets caused "no direct physical loss of or damage to property" is unsupported by case law, both in California and other jurisdictions. First, as discussed above, the human droplets are physically tangible in that they have physical mass, can be quantifiably measured in terms of mass and size, and physically affect the surfaces where they are present. Second, even if somehow these human droplets do not somehow physically affect or otherwise "physically injure" the premises, California courts have held that the definition of "property damage" may include coverage for loss of use of tangible property that is "not" physically injured. *See Thee Sombrero,Inc. v. Scottsdale Ins. Co.* (2018) 28 Cal.App.5th 729, 733 ["If your leased apartment was rendered uninhabitable by some noxious stench, you would conclude that you had lost the use of tangible property."]. The Central District of California has held that the presence of E. Coli bacteria in water was sufficient to cause direct physical damage to property and trigger business income coverage. *See Cooper v. Travelers Indem. Co. of Illinois* (N.D. Cal. Nov. 4, 2002) No. C-01-2400-VRW, 2002 WL 32775680, at *3, aff'd. (9th Cir. 2004) 113 F.App'x 198. Similarly, courts in other states have held that smoke from a nearby fire and the stench of cat urine from a nearby property similarly triggered coverage. *See, e.g., Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.* (D. Or. June 7,



SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

2016) 13 No. 1:15-CV-01932-CL, 2016 WL 3267247, at *9; *Mellin v. N. Sec. Ins. Co., Inc.* (2015) 167 N.H. 544, 550. In addition, a government order to suspend operations has been held to constitute a direct physical loss sufficient to trigger coverage even where no other damage to the insured premises resulted. *See U.S. Airways, Inc. v. Commonwealth Ins. Co.* (2004) 64 VA. Cir. 408.

56. More recently, in the context of COVID-19 litigation, in *Friends of DeVito v. Wolf* (Pa., Apr. 13, 2020) No. 68 MM 2020, 2020 WL 1847100, the Pennsylvania Supreme Court concluded that business losses caused by the COVID-19 pandemic are indistinguishable from those caused by other natural disasters like earthquakes, hurricanes, and fires. This is highly significant because these are all major casualty events for which commercial property insurance is intended to provide coverage. This is particularly significant in this case where the endorsement page failed to disclose an actual virus exclusion (the title of the endorsement is "Limited Fungi, Bacteria, or Virus Coverage" instead of an explicit Virus Exclusion), and this mislead consumers.

57. Any policy that does not have such a clear and unequivocal exclusion for viruses is, at the very least, ambiguous and that ambiguity should give rise to coverage for losses caused by the COVID-19 pandemic. *See AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822. Indeed, the Limited Fungi, Bacteria or Virus Endorsement Coverage Form in Founder's Policy is dated 2005, prior to the introduction of the 2006 ISO standard exclusion of losses. *See* Exhibit D, at p. 1.

58. In the case of *In re Chinese Manufactured Drywall Products Liability Litigation* (E.D. La. 2010) 759 F.Supp.2d 822, 831–834, a federal court acknowledged that "insurance policies all define 'property damage' to include loss of use of tangible property" and that:

> The court is required to **interpret each provision in a contract in light of the other provisions, so that each is given the meaning suggested by the contract as a whole**. La. Civ. Code art.2050; *Coleman v. School Bd. Of Richland Parish* (5th Cir. 2005) 418 F.3d 511, 517. Accordingly, the Court finds that the inclusion of "loss of use"



SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

> as a type of property damage in the policies suggests that the damage caused by the Chinese-manufactured drywall in Plaintiffs' homes constitutes a covered physical loss since the drywall prevents the Plaintiffs from fully using and enjoying their homes [. . .] The Court finds, based upon the foregoing analysis, that the alleged damages to Plaintiffs' homes caused by Chinese drywall constitute a covered "physical loss" for purposes of their homeowners' policies.

*Id.* at p. 832; see also Cal. Civ. Code § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."]; *S. Kornreich & Sons, Inc. v. Genesis Ins. Co.* (1997) 56 Cal.App.4th 407 [holding that the court must interpret the insurance policy as whole, with each clause lending meaning to other]; *Dupuy v. USAA* 15 *Cas. Ins. Co.* (M.D. Louisiana, March 9, 2012) 2012 WL 832291, at p. *3.

59. Defendants' Spectrum Business Policy is a 137-page document of numerous standard forms, endorsements, and special provisions that repeatedly promise coverage with one hand and then attempt to take it away with the other. Its provisions, in many respects, are anything but conspicuous, plain, and clear. As such, inconsistencies in the language of an insurance policy that create ambiguities must be construed in favor of providing coverage for the insured. *See AIU Ins. Co. v. Superior Court*, *supra*, 51 Cal.3d at p. 822; see also *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [explaining that courts must interpret ambiguous policy provisions in accord with "the objectively reasonable expectations of the insured."]

60. Much of the subject Policy's complexity can be ascribed to its reliance on a myriad of endorsements. While endorsements in a policy control over the form policy language, those endorsements are nevertheless required to be conspicuous, plain, and clear so as to protect the reasonable expectations of the insured. "Neither the prevalence of endorsements in the industry nor our recognition that they may validly modify an insurance policy diminishes an insurer's burden in notifying insureds of reductions in otherwise reasonably expected coverage." *See Tomaselli v. Transamerica Ins. Co.* (1994) 25

Cal.App.4th 1269, 1281–1282. Specifically, an insurer cannot rely on esoteric provisions to limit coverage, and "[i]f it deals with the public on a mass basis, the notice of noncoverage of the policy, in a situation in which the public may reasonably expect coverage, must be conspicuous, plain, and clear." *Haynes v. Farmers Ins. Exch.* (2004) 32 Cal.4th 1198, 1208, (citations omitted.)

61. Nevertheless, when each provision of the Policy is interpreted in light of its other provisions, it becomes clear that Hartford Defendants' interpretation of "physical loss" is not consistent with the scientific facts of human droplets being physically distinct from the virus, and/or is also inconsistent with the Policy's own language. The Policy offers no definition for "Property Damage" in its twenty-five page "Special Property Coverage Form" (SS 00 07 07 05). Significantly, however, a definition for "Property Damage" is found in the "Business Liability Coverage Form" (SS 00 08 04 05). This Form defines "Property Damage," in relevant part as the: "**[l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.**" (Exhibit A, p. 80, emphasis added.) That same section defines "Occurrence" as

> **"[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in bodily injury or property damage first manifested after the inception date of this policy and not first manifested after the expiration or cancellation date of this policy**."

(Exhibit A, p. 79, emphasis added.)

62. Under these definitions, Founder has suffered direct physical loss or damage to its Insured Property either by the human droplets, the virus, or both simultaneously. This damage was in the form of loss of use resulting from repeated and continuous community and property exposure to the human droplets and/or to the virus particles. The COVID-19 pandemic, the community spread of coronavirus, and its infection at the Insured Properties easily satisfies the definition of an "occurrence," as with any other



SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

covered "natural disaster." *See Friends of DeVito v. Wolf*, *supra*, 2020 WL 1847100, at p. *12 ["[A]ny location (including [the insured's] business) where two or more people can congregate is *within the disaster area*."], (emphasis added.) Despite the Policy's express language and the weight of legal authority on point, however, Hartford Defendants persist in their unreasonable position that the COVID-19 pandemic and presence of human droplets and/or coronavirus is not a covered loss.

63. Moreover, Sentinel's and HFSG's interpretation of the operative Policy provisions runs the risk of rendering important coverage provisions illusory, particularly as to the Policy's purported "Limited Fungi, Bacteria or Virus Coverage" (Form SS 40 93 07 05). It is well-settled that a policy cannot be interpreted in such a fashion as to render coverage illusory:

> When reasonably practical, contracts are to be interpreted in a manner that makes them reasonable and capable of being carried into effect, and that is consistent with the parties' intent. [citation] A provision will not be construed to nullify the very purpose of a vendor's endorsement, causing a forfeiture where the parties intended coverage. [citation] **An interpretation that would render the objectively reasonable expectations of the insured for coverage under the policy "meaningless" is an example of an illusory coverage** [citation] **Factors that may be considered in determining the existence of "illusory coverage" are: (1) the business of the insured; and (2) the procedures of the insured in carrying on its business**.

*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 874, (emphasis added.)

64. The Limited Virus Coverage provides limited coverage for viruses. Despite this provision, Defendants claim that the novel coronavirus' presence and presence on physical surfaces does not create a "direct physical loss." Even more remarkable, Defendants seem to ignore the fact that it is human droplets, and not the virus, that actually create the peril when droplets are the scientifically identified vehicle of transmission of the COVID-19 virus particles. Taking Founder's allegations above as

true, at the very least there should be a consideration that the Limited Virus Coverage may not or does not apply to human droplets. Indeed, where there is an ambiguity, such ambiguity needs to be resolved in favor of Founder and not the Hartford Defendants as the insurers.

65. However, assuming for the sake the argument that the droplets and the virus are indistinguishable (even though it is scientifically proven and not fiction that they are two different matters), Hartford Defendants' interpretation renders the subject coverage illusory because, if Hartford Defendants' position is to be accepted, then the claimed Limited Virus Coverage would not apply to *any* virus whatsoever. Such an interpretation effectively, actively, and improperly renders the "Limited Virus Coverage" terms meaningless and manifestly illusory because it "defeats the objectively reasonable expectations of the insured." *See Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, *supra*, 78 Cal.App.4th at p. 874. As discussed previously, such an interpretation literally goes against science. The deadly coronavirus in fact can remain viable inside human droplets and is transmittable on surfaces and physical property where the droplets are present for a prolonged period. As such, Defendants' position that a virus is not covered under these circumstances makes coverage under the Limited Virus Coverage illusory and constitutes bad faith.

66. Further evidence of the illusory nature of Defendants' interpretation of the Policy is manifest in Defendants' reference to a purported pollution exclusion that applies to "loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release, or escape of pollutants and contaminants" as if it somehow vitiates coverage for damage caused by the human droplets or by the deadly coronavirus. (Exhibit A, pp. 45-46.) Such a position, however, is inapplicable to the human droplets, and is futile with respect to the virus, and would render Limited Virus Coverage illusory and meaningless. The California Supreme Court decided this very issue in *McKinnon v. Truck Ins. Exch.* (2003) 31 Cal.4th 635. In *McKinnon*, the Court held that a pollution

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

exclusion did not apply to damage caused by a chemical pesticide that killed a person because the disputed exclusion applied only to environmental pollutants. *See also Paternostro v. Choice Hotel Int'l Sers. Corp.* (E.D. LA 2014) 2014 WL 6460844 at *1 [holding bacteria does not qualify as a pollutant]; *Keggi v. Northbrook Prop. & Cas. Ins. Co.* (Ariz. App. 2000) 13 P.2d 785, 790 [finding pollution exclusion did not include bacteria]. It is bad faith for Hartford Defendants to not even consider the scientific difference between human droplets and virus in analyzing the physical loss, and to brush off the scientific evidence in order to deny coverage. Moreover, even if it is later proven that human droplets are indistinguishable from the virus, it is still bad faith for the Hartford Defendants to issue a special endorsement that covers viruses and then take the position that a virus is an excluded pollutant under another provision of the Policy. In this case, Hartford Defendants' position, quite literally, seeks to take away with one hand, through a patently inapplicable pollution exclusion, what it has already given with another. Hartford Defendants' position is in direct violation of the well-established California Concurrent Causation doctrine, codified in Cal. Ins. Code. § 532.

67. Additionally, the Policy claimed to provide coverage for lost income—including income lost due to the government lock-down orders—through a civil authority coverage provision. Specifically, the Policy provides coverage for lost income **"when access to your 'scheduled premises' is specifically prohibited by order of a civil authority."** Exhibit A at p. 39; Exhibit B at p. 3 (emphasis added.) Here, the Santa Clara County and State of California Government Orders prohibited access to the Insured Property, and Founder incurred losses due to the suspension of business operations resulting from that prohibition. However, in seeking to deny coverage, Defendants point to an "Acts or Decisions" exclusion that claims to exclude "loss caused by or resulting from the decision of any person, group, organization, or governmental body." Exhibit A, p. 46.; Exhibit B at p. 6. Defendants' interpretation of the Policy, in reliance on this exclusion, succeeds in rendering the civil authority coverage provision meaningless.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

Once again, only the illusion of coverage for business income loss due to a government lock-down order is provided and "the insured receive[s] no benefit under the policy." *See Jeff Tracy, Inc. v. U.S. Specialty Ins. Co.* (C.D. Cal. 2009) 636 F.Supp.2d 995, 1007, citing to *Md. Cas. Co. v. Reeder* (1990) 221 Cal.App.3d 961, 978. Effectively, and predictably, Defendants claim to cover "action of civil authority" with one hand, and take it away with the other by operation of a provision that purports to exclude the "Acts or Decisions" of a "governmental body." As such, Defendants' position reveals that any civil authority coverage was merely an illusion because Defendants never intended to provide such coverage. Here, again, it is bad faith for the Defendants to claim to provide coverage for loss of business income resulting from actions of civil authority and then take the position that such actions are entirely excluded by another provision of the Policy. It is concerning that the policy appears to be possibly deliberately or at the very least recklessly drafted to be illusory.

**FIRST CAUSE OF ACTION**

**(Breach of Contract by Plaintiff Against All Defendants)**

68. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

69. Plaintiff was insured under a valid insurance policy, the aforementioned and described Policy, issued by Defendants which was in effect on the date the loss occurred.

70. Plaintiff paid consideration in the form of premiums for Policy, and have faithfully performed all obligations required to be performed by them under the terms of the Policy, except to the extent performance may have been excused by, among other things, Defendants' bad faith conduct and breach of the insurance policy.

71. Defendants breached the terms of the contract by not providing requisite documentations required for submitting claims, by prematurely and without basis or reasonable good faith analysis denying and/or "closing" the claim without proper

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

analysis or explanation, and by ultimately failing to pay and/or underpaying monies due under the contract and by forcing Plaintiff to file this action.

72. Plaintiff has demanded that Defendants pay, and Defendants have declined to pay, Plaintiff's claims for damages and losses of business income and additional expenses due to Civil Authority, specifically the issuance of the Santa Clara Ordinance and State of California Order which limited public access to Founder Institute.

73. As a direct, proximate, and legal result of Defendants' breach of contract, Plaintiff has been, and continues to be, damaged in an amount in excess of the jurisdictional limits of this Court, including but not limited to: damage suffered to their business caused by the loss of business income and additional expenses created by the Santa Clara Ordinance and State of California Order, the loss of benefits due under the contract, and consequential damages including interest on the monies Plaintiff could and should have received promptly, but which they did not receive in a timely manner as a result of Defendants' breach of the contract, as well as other fees, expenses, and costs to be proven at trial.

74. Plaintiff has also sustained other economic losses as a direct, proximate, and legal result of Defendants' conduct, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against All Defendants)**

75. Plaintiff re-alleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

76. Plaintiff's insurance policy at issue in this action, the aforementioned Policy, contains an implied covenant of good faith and fair dealing, whereby Defendants, and each of them, agreed to perform their obligations under the Policy in good faith, to deal fairly with Plaintiff, and not to unreasonably deprive Plaintiff of the benefits due under the insurance policy.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

77. Defendants tortiously breached the implied covenant of good faith and fair dealing arising from the insurance contract by unreasonably denying or withholding benefits due under the Policy, by failing to conduct fair and objective claims investigation and issuing preordained denials and pre-claim communications aimed to discourage claims, by failing to treat Plaintiff fairly and by other conduct, including but not limited to that expressly set forth in this Complaint, after accepting insurance premiums from Plaintiff. On information and belief, it appears from the pattern of pre-denial and cut and pasted communications by agents that Defendants were, and are, executing a directive to deny COVID-19 claims systematically.

78. Despite Plaintiff's request for coverage and demand for payment of the compensation for the business disruption caused by the Santa Clara Ordinance and State of California Order, Defendants denied coverage and blocked access to information and engaged in a continuous pattern of tortious conduct which has and will cause Plaintiff continued damages.

79. Defendants engaged and continue to engage in the course of conduct to further their own economic interest, including and in violation of their obligations to Plaintiff. This conduct includes, but is not limited to that conduct alleged in this Complaint and the following:

a. Failing to perform competent and/or complete investigation of the request for coverage;

b. Misrepresenting the content of the Policy to Plaintiff;

c. Deliberately, unjustifiably, and unreasonably denying coverage and hiding essential information in an effort to discourage Plaintiff from pursuing their full policy and benefits;

d. Refusing to pay any or adequate insurance benefits which a reasonable person would have believed Plaintiff was entitled to receive;

e. Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of Plaintiff's claims, and instead providing a boilerplate, inapplicable explanation; and

f. Plaintiff is informed, believe and thereon alleges, that Defendants have breached their duties of good faith and fair dealing owed to Plaintiff by other acts or omissions of which Plaintiff is presently unaware and which will be shown according to proof at the time of trial.

80. Without any reasonable basis for doing so, and with full knowledge and/or conscious disregard of the consequences, Defendants have failed and refused to act in good faith or act fairly toward Plaintiff. Furthermore, Defendants have in bad faith failed and refused to perform their obligations under the insurance policy and under the laws of the State of California.

81. Defendants engaged in conduct that was malicious, fraudulent, and oppressive. Indeed, Defendants engaged in a scheme designed to quickly deny Plaintiff's claim. The Hartford Defendants unreasonably denied and/or "closed" Plaintiff's claim without investigating the actual cause of the loss and business interruption—i.e., the Civil Authority orders themselves and their multiple expressly stated policy objectives including preventing overrun of the health system and the City, County and State concern for surface contamination by human droplets and damage and person to person transmission.

82. As a direct, proximate, and legal result of said breaches of the covenants of good faith and fair dealing by Hartford, Plaintiff has been damaged and continues to incur each and every day substantial and foreseeable consequential and incidental damages, including loss of income and net profits and other expenses related to complying with the Santa Clara Ordinance and State of California Order, and other costs in an amount according to proof. Plaintiff was and will be forced to expend attorneys' fees and costs in pursuing relief to which they are entitled as a matter of law. Pursuant to *Brandt v.*

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

*Superior Court* (1985) 37 Cal.3d 813, Plaintiff is entitled to attorneys' fees and costs reasonably incurred to compel the payment of benefits due under the insurance policies.

83. As a further direct, proximate and legal result of the wrongful conduct of Defendants, and each of them, Plaintiff has also sustained other economic damages, as set forth above, and other damages in an amount to be proven at trial.

84. On the basis of all of the facts alleged herein, Defendants' conduct and actions were despicable, done maliciously, oppressively, and fraudulently, with the intent to deprive Plaintiff of insurance benefits and to cause injury to Plaintiff. Defendants' conduct and actions were further done with a willful and conscious disregard of Plaintiff's rights, thereby subjecting Plaintiff to unjust hardship and distress in the midst of a global pandemic where Plaintiff will play a critical role in economic recovery of other businesses. Defendants, its officers, directors, and managing agents were personally involved in the decision-making process with respect to the misconduct alleged herein and to be proven at trial, as suggested already, even prior to discovery, by verbal and written communications showing the appearance of a pre-planned, rapid denial of COVID-19 claims.

85. Plaintiff alleges on information and belief that Defendants, through their representatives, officers, directors, and managing agents, authorized and ratified each and every act on which Plaintiff's allegations of punitive damages herein are based upon. On that basis, pursuant to California Civil Code § 3294, Plaintiffs are entitled to an award of exemplary and punitive damages in an amount adequate to make an example of, and to punish and deter Defendants and each of them.

**<u>THIRD CAUSE OF ACTION</u>**

**(Bad Faith Denial Against All Defendants)**

86. Plaintiff re-alleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

87. Defendants have in bad faith failed or refused to perform their obligations under the Policy and under the laws of California because Defendants have put their own interests above those of Plaintiff.

88. Defendants denied Plaintiff’s claim in bad faith, among other things, when Defendants (a) failed or refused to perform a fair, objective, and thorough investigation of the claim as required by California Insurance Code; (b) raising coverage defenses that were factually and/or legally invalid, (c) improperly denying coverage by creating unduly restrictive claim interpretations on the terms of the Policy, and ultimately forcing Plaintiff to engage in litigation to recover the amounts due under the Policy.

89. On information and belief, Plaintiff alleges that there are numerous other individuals, business entities, and other groups insured by Defendants who were or are similarly situated by Plaintiff in that they were denied coverage using similar unlawful tactics used to deny Plaintiff’s claim coverage. At such time as Plaintiff learn the names of such parties, Plaintiff may seek leave of court to join such persons as additional Plaintiff in this action.

90. Based on the foregoing allegations, Plaintiff alleges Defendants have committed institutional bad faith and that what Plaintiff experienced is not an isolated incident but rather a systematic and organized unfair practices perpetrated against Defendants’ clients. The pattern of unfair practices constitutes intentional wrongful conduct that is institutionalized in Defendants’ established company policy.

91. As a proximate result of Defendants’ bad faith conduct above, Plaintiff has suffered and will continue to suffer damages. These damages include interest on the withheld and unreasonably delayed payments due under the policy and other special economic and consequential damages, in an amount to be proven at trial.

92. Plaintiff was forced to retain legal counsel to obtain benefits due under its policy as a result of Defendant’s bad faith conduct. As such, Plaintiff is entitled to recover from

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

Defendants attorney fees and other reasonable costs of litigation incurred by Plaintiff in order to obtain the benefits of the policy.

93. On the basis of all of the facts alleged herein, Defendants' conduct and actions were despicable, done maliciously, oppressively, and fraudulently, with the intent to deprive Plaintiff of insurance benefits and to cause injury to Plaintiff. Defendants' conduct and actions were further done with a willful and conscious disregard of Plaintiff's rights, thereby subjecting Plaintiff to unjust hardship and distress in the midst of a global pandemic where Plaintiff is serving an essential and critical function. Defendants, its officers, directors, and managing agents were personally involved in the decision-making process with respect to the misconduct alleged herein and to be proven at trial, as suggested already, even prior to discovery, by verbal and written communications showing the appearance of a pre-planned, rapid denial of COVID-19 claims.

94. Plaintiff alleges on information and belief that Defendants, through their representatives, officers, directors, and managing agents, authorized and ratified each and every act on which Plaintiff's allegations of punitive damages herein are based upon. On that basis, pursuant to California Civil Code § 3294, Plaintiff is entitled to an award of exemplary and punitive damages in an amount adequate to make an example of, and to punish and deter Defendants and each of them.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief by Plaintiffs Against All Defendants)

95. Plaintiff re-alleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein. Under California Code of Civil Procedure § 1060 et seq., the Court may declare rights, status, and other legal relations whether or not further relief is or could be claimed. It is also likely that the COVID-19 pandemic may trigger subsequent claims by Plaintiff

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

under this Policy if the pandemic occurs in cycles, as has been predicted by some health experts.

96. An actual controversy has arisen between Plaintiff and Defendants as to the rights, duties, responsibilities, and obligations of the parties in that Plaintiff contends that and Defendants deny that : (1) the civic orders issued by the Government of State of California and the County of Santa Clara constitute a prohibition of access to Plaintiff's business or so-called described premises under the Policy; (2) the prohibition of access to the described premises by the various orders triggers the Civil Authority business income loss and additional expenses portion of the Policy; (3) said civic orders trigger coverage without applicable exclusion because the civil authorities in question were concerned for ongoing damage including the presence of human droplets and/or viral particles that might be in said droplets or otherwise present outside of the business; and (4) the Policy provides coverage to Plaintiff for such orders and also provides coverage elsewhere in the Policy as plead above. Resolution of the duties, responsibilities, and obligations of the parties is necessary as no full adequate remedy at law exists given the potential ongoing and cyclical nature of the pandemic and the damage that can occur with these orders, and a declaration of the Court is needed to resolve the dispute and controversy.

**FIFTH CAUSE OF ACTION**

**(Unjust Enrichment Against All Defendants)**

97. Plaintiff re-alleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

98. As set forth above, Plaintiff may lose the financial benefit of the amounts that Plaintiff has paid for those portions of the policy that were illegal, unfair, or deceptive because of Defendants' unlawful conduct.

99. Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff because of their wrongful acts and omissions.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

100. Specifically, Defendants were unjustly enriched when Defendants offered insurance coverages through their policy which purport and appear to provide coverages for loss of business income due to Civil Authority or civil ordinance, but instead Defendants refused to fulfill their financial obligation to Plaintiff and denied coverage in a rapid fashion without any evidence of properly conducting review or investigation to the claims, suggesting that Defendants have no intention to pay the insurance coverage owed to Plaintiff.

101. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages and is entitled to restitution in an amount to be proven at trial. Plaintiff seeks restitution from Defendant and seek an order from the Court to disgorge all monies paid to Defendants as a result of the unlawful, illegal, and/or fraudulent business practices.

102. Plaintiff has no adequate remedy at law.

**SIXTH CAUSE OF ACTION**

**(Violation of California Bus. & Prof. Code § 17200 Et Seq. Against All Defendants)**

103. Plaintiff re-alleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

104. Section 17200 of the California Business & Professions Code ("Unfair Competition Law" or "UCL") prohibits any "unlawful," "unfair," and "fraudulent" business practice.

105. Section 17200 specifically prohibits any "***unlawful*** . . . business act or practice." Defendants have violated the UCL's prohibition against engaging in unlawful act or practice by, *inter alia*, denying Plaintiff's claim for coverage and such action violates California state laws.

106. By improperly denying Plaintiff's claim, Defendants violated California's Unfair Insurance Practice Acts (UIPA), codified as California Insurance Code Section 790.03(h), including but not limited to the following unfair claim practices:

a. Misrepresenting to Plaintiff pertinent facts or insurance policy provisions relating to any coverages at issue;

b. Issuing a boilerplate letter in record time and appearing to have pre-ordained a denial of claims as part of a systemwide campaign by Hartford Defendants to dissuade policyholders from even submitting claims; and

c. Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies, not spending time to carefully read the language of their own Policy and failing to identify and analyze what actually triggered the Civil Authority ordinances or orders in question.

107. It is also believed that Hartford Defendants are attempting to contract around California Insurance Code by attempting to enforce an unenforceable virus exclusion even before a claim was submitted and ultimately in contravention of a covered peril (i.e. the effects of a civil ordinance) which was the primary and proximate cause of Plaintiff's business losses to date. Hartford Defendants' conduct is therefore unlawful, and the exclusion clause unenforceable.

108. Section 17200 also prohibits any "***unfair*** . . . business act or practice." As described in the preceding paragraphs, Defendants engaged in the unfair business practice of denying business disruption insurance claims even though Defendants' policy language covers such losses and attempting to dissuade even the submission of the claims by disseminating false information about what the Policy covers. It also appears the Policy was drafted in a manner that reflects a possible systematic use of illusory promises, promising coverage on one hand in a lengthy, complex document while taking it away with another in other parts of the policy.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

109. Defendants' business practices, as detailed above, are unethical, oppressive, and unscrupulous. They violate fundamental policies of this State including the very policies underlying the Santa Clara Ordinance and State of California Order which aim to protect the general population and the County for a finite period of time but not cause unreasonable closure or business loss for businesses. Further, any justifications for Defendants' wrongful conduct are outweighed by the adverse effects of such conduct, which in this case is jeopardizing operations of a business that will play a critical role in recovery of the local economy by catalyzing the recovery and growth of startups. Thus, Defendants are engaged in unfair business practices prohibited by California Business & Professions Code §17200 et seq.

110. Section 17200 also prohibits any "***fraudulent business act or practice***." Defendants violated this prong of the UCL by disseminating and/or agreeing to disseminate, through Defendants' website and other promotional channels, misleading and partial statements about available business disruption or closure coverages that have a tendency to mislead the public, and also at the time they marketed their policies, misleading consumers to believe they would be insured for this kind of business interruption. Further, Defendants violated this prong of the UCL by omitting material information about business disruption coverages with the intent to induce reliance by consumers to not pursue such claims even though Defendants have an obligation to compensate them under their Policy. Defendants' claims, nondisclosures, and misleading statements concerning business closure coverage and/or lack thereof, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of California Business and Professions Code §17200. They were and are intended to dissuade businesses from seeking coverage. Moreover, it now also appears that the policy may have been drafted by design to be illusory.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

111. Section 17200 also prohibits any "unfair, deceptive, untrue, or misleading advertising." For the reasons set forth above, Defendants engaged in unfair, deceptive, untrue, and misleading advertising in violation of California Business & Professions Code § 17200.

112. Defendants' conduct caused and continues to cause substantial injury to Plaintiff. Plaintiff has suffered injury in fact and lost money as a result of Defendants' unfair conduct.

113. Additionally, pursuant to California Business and Professions Code § 17203, Plaintiff seeks an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices and requiring Defendants to pay the monies owed to Plaintiff.

## SEVENTH CAUSE OF ACTION

**(Injunctive Relief Under Bus. & Prof. Code § 17200 Et Seq. Against All Defendants)**

114. Plaintiff re-alleges and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

115. Upon information and belief, Plaintiff alleges that unless enjoined by the order of the Court, Defendants will continue their unlawful practices of denying coverages to policyholders with legitimate claims just like Plaintiff who are literally trying to survive by the day due to the COVID-19 global pandemic emergency. No adequate remedy exists at law for the injuries alleged herein, and Plaintiff will suffer great and irreparable injury if Defendant's conduct is not immediately enjoined and restrained.

116. Defendants wrongfully denied Plaintiff's insurance claim without any conducting a proper claim review and investigation, and likely doing so to avoid their financial obligations to Plaintiff and their policyholders. Given the uncertainty of when the pandemic emergency can truly end and the likely continued effect of the closure

orders, it is foreseeable for Plaintiff to have similar and additional insurance claims in the future, and Defendants could use similar tactics to deny coverage to Plaintiff similar to the situation led to this instant action. If Defendants' conduct is not restrained or enjoined, Plaintiff will suffer great and irreparable harm, as it has already paid the premium due for the insurance policy, and Defendants seem committed to continuing their unlawful practices of erroneously denying claims and will likely continue to do so without an injunction from the Court.

117. Plaintiff has no adequate remedy at law for the threatened injury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1. For general, compensatory damages, plus prejudgment interest and other damages according to proof;
2. For special and consequential damages;
3. For punitive and exemplary damages according to proof and as applicable under the law;
4. For restitutionary disgorgement of all profits Defendants obtained as a result of unlawful, unfair, and/or fraudulent business practices;
5. For an appropriate injunction;
6. For attorneys' fees and costs of suit herein;
7. For pre-judgment interest as provided for by applicable law; and
8. For such further relief as the Court may deem just and proper.

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

DATED: November 5, 2020

SANJIV N. SINGH, A PROFESSIONAL LAW CORPORATION

/s/ Sanjiv N. Singh

Sanjiv N. Singh, JD, MD

INDRAJANA LAW GROUP,
A PROFESSIONAL LAW CORPORATION

/s/ Michael B. Indrajana

Michael B. Indrajana
Attorneys for Founder Institute Incorporated

SANJIV N. SINGH
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402

INDRAJANA LAW GROUP
A PROFESSIONAL LAW CORPORATION
1650 S. AMPHLETT BLVD. SUITE 220
SAN MATEO, CA 94402